Ernest WILSON, Appellant,

v.

UNITED STATES, Appellee.

No. 00–CF–1234.

District of Columbia Court of Appeals.

Submitted May 28, 2002.

Decided July 11, 2002.

Geralyn R. Lawrence, Washington, DC, was on the brief, for appellant.

Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher, Elizabeth Trosman, David B. Deitch, and John P. Gidez, Assistant United States Attorneys, were on the brief, for appellee.

Before STEADMAN and FARRELL, Associate Judges, and BELSON, Senior Judge.

FARRELL, Associate Judge:

This appeal challenging the denial of a suppression motion presents the question of how *Illinois v. Wardlow,* 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) ("flight" in Fourth Amendment analysis), applies to the facts of this case. We hold,

primarily in light of *Wardlow,* that the police had a reasonable, articulable suspicion justifying the stop of appellant; and we affirm.

## I.

An indictment charged appellant with possession with intent to distribute PCP and possession of cocaine.[1] He moved to suppress drugs found on his person after police had stopped him in the corridor of an apartment building. At the motion hearing the evidence credited by the trial court was essentially as follows:

On March 6, 2000, at about 5:45 p.m., two Metropolitan Police (MPD) detectives were standing in the 1400 block of Fairmont Street, N.W., looking for a witness in connection with a homicide investigation. From his experience as an officer in the Third District, Detective Smith knew that the 1400 block of Fairmont Street was characterized by "a high level" of narcotics activity. Smith noticed two men walking toward the entrance to 1401 Fairmont Street, an apartment building. One, Dominic Ward, matched the description of the witness Smith was looking for; the other was appellant. Although Smith and his partner were in plain clothes, at least three marked police cars were parked in front of 1401 on unrelated business. Appellant and his companion looked at Smith and quickened their pace as "[he] paid more attention to them." Smith walked toward the men as they entered the building, and saw that "their pace quickened to the point where, once [he] got to the front door of the building, they were hurrying down the hallway and quickly went around the corner out of my sight." As Smith followed them down the hallway, he encountered uniformed MPD officers who were in the building on another investigation.

One of those officers, Sergeant Sporn, had been descending a flight of stairs when he saw appellant and Ward, followed at a distance by the two detectives. Seeing Sporn, appellant and Ward "quickly went around the corner" down another hallway. Of their movements Sporn testified: "If I was in a rush and needed to get somewhere quickly and not run, that's how I would describe it." Although now out of sight of appellant and Ward, Sporn suddenly heard "pounding on [a] door" from the direction in which the pair had moved; Detective Smith likewise heard a "commotion, some banging" from that direction, sounds he agreed resembled someone "banging on [a] door frantically." The police turned the corner and saw appellant standing next to the door to apartment 108. Ward was ten feet farther down the hallway and, on seeing Smith, seemed "agitated" and "spooked." A detective stopped Ward, who was near a stairwell, and other officers detained appellant by placing his hands against the wall. Ward was searched after Detective Smith saw him trying to hide tin foils in his pocket and smelled "the strong chemical odor of PCP" coming from his person. Sergeant Sporn then perceived that appellant too "reek[ed]" of PCP. He frisked appellant and felt a large bulge in his front pants pocket that, from the jagged edges of individual packets, he recognized as a bag containing tin foils of PCP. A full search of appellant revealed both PCP and cocaine in his possession.

At the hearing, the officers explained why appellant and Ward had been detained initially. Sergeant Sporn stated: "They were stopped because of the pounding on the door and the circumstances

---

1. The indictment also charged Dominic Ward with possession with intent to distribute co-

caine and possession of PCP. Ward's case was disposed of separately.

surrounding what was going on." Detective Smith elaborated: "[It was] based on both the defendants' actions at this point, they were very nervous that law enforcement was interested in them, they acted as if they had something to hide, the way they quickened their pace, and the way they basically attempted to [e]lude us once we got into the building."

In denying the motion to suppress, the trial judge found it reasonable to believe that appellant and Ward knew that police (and not unknown persons) had taken notice of their actions.[2] He also found reasonable the officers' belief that appellant and Ward were "trying to avoid [them]," first by quickening their pace as they walked down the apartment hallway and accelerating as they turned the corner, then by pounding on an apartment door in an attempt to be admitted.[3] Although the police had "no *specific* knowledge of a crime" appellant was suspected of having committed or being about to commit (emphasis added), the judge nonetheless found the issue to be whether the police "reasonabl[y] belie[ved] that [appellant] and Mr. Ward were fleeing [them] in a high drug area in what has to be a fairly tense environment in the hallway of this building," so as to justify a brief stop for investigation but not the further intrusion—at that point—of a frisk. He answered the question affirmatively, relying on *Illinois v. Wardlow, supra.* He went on to uphold the frisk on the basis of the intervening discovery of PCP on Ward and the smell of PCP coming from appellant's person.

Appellant then entered a conditional plea of guilty. *See* Super. Ct.Crim. R. 11(a)(2).

## II.

▉ To conduct a brief, investigatory stop of a person in keeping with the Fourth Amendment, a police officer must have a reasonable, articulable suspicion that criminal activity may be afoot. *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *see United States v. Arvizu,* 534 U.S. 266, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Wardlow,* 528 U.S. at 123, 120 S.Ct. at 675 (citation omitted). Appellant contends that no such justification was shown here—that the police had only an "inchoate and unparticularized suspicion or 'hunch'" of criminal activity. *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883. He argues that the Supreme Court's approval of the stop in *Wardlow* does not govern here because the Court there regarded only evasion of the police consisting of "[h]eadlong flight" as sufficient to justify a stop, in contrast to the mere "quickened pace" exhibited here; and in his view no other circumstances brought the police over the reasonable suspicion threshold. Although the trial judge considered application of *Wardlow* to the facts here to be very close, we agree with the result he reached.

2. Among other things, the judge pointed to the presence of the several marked police cars outside the apartment building. Moreover, before appellant and Ward turned the hallway corner, they saw Sergeant Sporn in police uniform.

3. There was testimony that, in response to the pounding, the occupant of apartment 108 came out into the hallway and exclaimed that Ward and appellant were unknown to her and unwelcome. However, the judge found that this took place "after the stop" of appellant but "before the frisk."

*Wardlow* resolved the issue, on which state courts had divided, of "whether unprovoked flight is sufficient grounds to constitute reasonable suspicion." 528 U.S. at 123 n. 1, 120 S.Ct. at 675 n. 1. The Court held that the defendant's "unprovoked flight upon noticing the police," combined with his "presence in an area of heavy narcotics trafficking," was enough to "warrant further investigation" that properly included a brief stop to attempt "to resolve the ambiguity" in the situation. *Id.* at 124, 125, 120 S.Ct. at 676. It began by stating that, although an individual's presence in an area of expected criminal activity, standing alone, will not support a stop, "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Id.* at 124, 120 S.Ct. at 676. The Court further explained that its prior cases had "recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." And "[h]eadlong flight—wherever it occurs—is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Id.* at 124, 120 S.Ct. at 676. The Court distinguished its past cases which had held that refusal to cooperate, without more, does not furnish reasonable suspicion and that one approached by police without such suspicion has a right to ignore the police and go about his business,[4] stating:

> [U]nprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not "going about one's busi-

ness"; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning.

*Id.* at 125, 120 S.Ct. at 676.

▮▮▮ Appellant contends that a fair reading of the opinion is that only "headlong flight"—implying a sudden act of bolting and unmistakable "running" from the police—meets the test of *Wardlow*. In our view that unreasonably limits the scope of the opinion. The Court's focus was upon an unprovoked instance of evasive behavior sufficient to allow the police reasonably to infer that an individual is not simply "going about [his] business" but may be engaged in wrongdoing.[5] While that action can be sudden, precipitous flight, it can also logically be a walk that accelerates as the person becomes aware of the police' attention, and ends in the near equivalent of a run—which is what happened in this case. On seeing the officers, Ward and appellant increased their pace as they entered the building and then hurried down the hallway before turning the corner as if "in a rush," but not running. Whether that conduct alone was enough to justify a *Terry* stop we need not decide. For the impression that their intent was to flee the police was strengthened when they frantically pounded on an apartment door, in a manner the police reasonably did not perceive as being "about the business" of requesting admittance by a relative or friend.[6] In these circumstances, we think

---

4. *See Florida v. Bostick*, 501 U.S. 429, 437, 111 S.Ct. 2382, 2387–88, 115 L.Ed.2d 389 (1991); *Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983).

5. The Court emphasized, as it had in prior cases, that "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human be-

havior." 528 U.S. at 125, 120 S.Ct. at 676 citing *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

6. The trial judge stated that "the defendants were trying to get into an apartment that they had no business being in." Because he also

*Wardlow* allowed the limited intrusion of a stop long enough to attempt to "resolve the ambiguity" in the defendants' behavior by briefly asking about their actions. Only when the police saw Ward with PCP and smelled the same drug coming from appellant's person did they expand the intrusion by frisking him.

Appellant points out that the police had no information apart from his evasive reaction that he had done anything criminal, and reminds us of *Terry's* bedrock holding that the police must have a reasonable, articulable suspicion that *criminal* activity—not vaguely suspicion-arousing behavior—may be afoot. But this in essence restates the conclusion rejected in *Wardlow* that unprovoked flight in a high crime area is insufficient to constitute reasonable suspicion. While the defendant in *Wardlow* was first seen "holding an opaque bag" in an area known for heavy narcotics trafficking, 528 U.S. at 121–22, 120 S.Ct. at 674–75 that fact played no part in the Court's reasoning which, after stating "among the relevant textual considerations in a *Terry* analysis" the fact "that the stop occurred in a 'high crime area,' " *id.* at 124, 120 S.Ct. at 676, dealt exclusively with the justification that flight provided for Wardlow's detention.[7] Citing the facts of *Terry* itself, the Court pointed out that conduct justifying a stop may be "ambiguous and susceptible of an innocent explanation," and that the purpose of the *Terry* stop is "to resolve [such] ambiguity." *Id.* at 125, 120 S.Ct. at 677. Appellant's additional suggestion that the police "provoked" his effort to escape them is unpersuasive. Whatever precisely the Court meant by

that qualifier (*"unprovoked* flight"), Detective Smith and his partner had merely looked at appellant and Ward ("I observed them, they observed me") and started toward them when the defendants entered the building and accelerated their steps down the hallway.

Appellant further argues that upholding his stop on the basis of his evasive behavior and presence in a high narcotics neighborhood contradicts our holding in *Smith v. United States,* 558 A.2d 312 (D.C.1989); *see also id.* at 317 (alternative majority opinion). The government, for its part, suggests that the court's treatment of flight in *Smith* has been superseded by *Wardlow* and, too, that *Smith* applied the sort of "divide-and-conquer" approach—considering the relevant *Terry* factors "in isolation from each other"—which the Supreme Court rejected in *Arvizu,* 122 S.Ct. at 751. The latter position misreads *Smith,* where the lead opinion was explicit in "examining ... individually *and* collectively" the factors argued to it as establishing reasonable suspicion. *Id.* at 314 (emphasis added). And this case does not require us to decide whether *Smith's* refusal to assign weight to flight on *its* facts is consistent with *Wardlow.* Mainly distinguishing *Smith* from this case is that "there was no basis for the officer to draw a rational and reasonable belief that Smith himself believed [he was being pursued by] police officers." *Smith,* 558 A.2d at 317; *see also id.* at 319 (alternative majority opinion) (fact that record failed to show clearly enough "that Smith knew [Officer] Lawson and his colleagues were the police instead of, for example, a gang of fast-

found that the occupant of the apartment did not come out and declare the two men unwelcome strangers until after appellant was stopped, we interpret this reference to their having no business there as stating an inference the police could draw from the act of

loudly banging on a door knowing police are close behind.

7. The Court expressed no opinion whether the ensuing frisk of Wardlow was lawful "independently of the stop." 528 U.S. at 124 n. 2, 120 S.Ct. at 676 n. 2.

driving toughs" was an "even ... more fundamental reason" for discounting the significance of his quick departure). Here the trial judge found that appellant reasonably knew he was evading police officers, and we have no reason to disturb that finding. See note 2, *supra.* Appellant therefore is not, as he contends, situated just like other persons who might have innocently been hurrying out of the way of "trouble" (predictable from the presence of several police cruisers in the neighborhood): he and Ward fled only when they knew that police officers had observed and begun to follow them. Furthermore, the sequence or *pattern* of conduct by appellant evincing flight—accelerating his pace as he walked down the hallway, turning the corner as if "in a rush," and banging on an apartment door—is more generative of reasonable suspicion than was the simple act of "walk[ing] at a fast pace" that the court found too ambiguous in *Smith.*

■ We therefore sustain the trial court's conclusion that the police had objective justification to stop appellant. *See Thompson v. United States,* 745 A.2d 308, 312 (D.C.2000) (Essentially, this Court's role in reviewing the denial of a motion to suppress is to ensure that the motions judge had a " 'substantial basis for concluding that no constitutional violation occurred.' "). Those grounds for a stop increased to probable cause to arrest him and search him incident to the arrest when Sergeant Sporn, a veteran officer familiar with the odor and packaging of PCP, saw another officer remove tin foils of PCP

from Ward's pocket and detected "a really strong odor of PCP" coming from both appellant and Ward. *See, e.g., Minnick v. United States,* 607 A.2d 519, 525 (D.C. 1992) (odor of PCP from defendant's car provided probable cause to arrest her and search her purse found in car; fact that search of purse preceded the actual arrest was of no legal consequence); *State v. Moore,* 90 Ohio St.3d 47, 734 N.E.2d 804, 808 (2000) (officer with extensive training and experience in identifying and detecting smell of marijuana had probable cause to search defendant based on strong odor of marijuana coming from automobile and his person); *People v. Darby,* 263 A.D.2d 112, 701 N.Y.S.2d 395, 397 (N.Y.App.Div.2000) (officer familiar with PCP from training and experience had probable cause to stop and search defendant based on strong smell of PCP wafting from him). *See also United States v. Bolden,* 429 A.2d 185, 186 (D.C.1981) (probable cause existed where trained police officer "recognized the smell of marijuana and the telltale fold of a PCP tinfoil package").[8]

*Affirmed.*

---

8. Thus we need not rely on the "plain feel" analysis which the trial court employed based on the pat-down of appellant. *See Minnesota v. Dickerson,* 508 U.S. 366, 371 n. 1, 113 S.Ct. 2130, 2134, 124 L.Ed.2d 334 (1993). On undisputed facts, the court may affirm for reasons other than those stated by the trial judge, *see Alston v. United States,* 518 A.2d 439, 440 n. 2 (D.C.1986)—although it is noteworthy that the judge, without referring expressly to probable cause, found that the officers "had [a] reasonable basis to think that the strong odor of PCP was coming from [appellant]."