*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CF-1523

EVERETT MILES, APPELLANT,

v.

UNITED STATES, APPELLEE.

FILED 03/29/2018
District of Columbia
Court of Appeals
Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(CF2-4696-13)

(Hon. Stuart G. Nash, Trial Judge)

(Argued May 12, 2016                          Decided March 29, 2018)

*William T. Morrison* for appellant.

*Monica P. Dolin*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney, and *Elizabeth Trosman* and *Uma M. Amuluru*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN, BECKWITH, and MCLEESE, *Associate Judges*.

Opinion for the court by *Associate Judge* Beckwith.

Dissenting opinion by *Associate Judge* McLeese at page 27.

BECKWITH, *Associate Judge*:  Appellant Everett Miles challenges the trial

court's denial of his motion to suppress tangible evidence, arguing that the police

lacked reasonable articulable suspicion to conduct the *Terry* stop[1] that led to his being charged with and later convicted of several gun-related offenses.[2] He argues that the anonymous tip that formed the basis for his stop—a 911 call from a "concerned citizen" describing a man with characteristics similar to Mr. Miles's, "shooting a gun in the air"—was insufficiently corroborated and thus was not shown to be reliable. He contends, in particular, that his flight when police officers approached him near the location of the alleged shooting was not sufficient to corroborate the tip. We agree and therefore reverse.

## I.

At the suppression hearing, the government presented the testimony of Metropolitan Police Department (MPD) Officers Juan Sanchez and Shalonda Davis. Officer Sanchez testified that he was on patrol in Southeast D.C. at around 8 a.m. on March 24, 2013, when he heard a series of radio transmissions about a

---

[1] *See Terry v. Ohio*, 392 U.S. 1 (1968).

[2] After a jury trial, Mr. Miles was found guilty of carrying a pistol outside a home or place of business, D.C. Code § 22-4504 (a)(2) (2012 Repl.); unlawful possession of a firearm by a convicted felon, D.C. Code § 22-4503 (a)(1) (2012 Repl.); possession of an unregistered firearm, D.C. Code § 7-2502.01 (2012 Repl.); and unlawful possession of ammunition, D.C. Code § 7-2506.01 (a)(3) (2012 Repl.). The jury acquitted Mr. Miles of threatening to injure a person, D.C. Code § 22-1810 (2012 Repl.), and assaulting, resisting, or interfering with a police officer, D.C. Code § 22-405 (b) (2012 Repl.).

man with a gun. These transmissions were played at the suppression hearing.[3] The initial transmission stated that a "concerned citizen" who did not give a "callback number" had reported "a black male with a blue army jacket . . . shooting a gun in the air." The radio transmission described the subject's location as the "4500 [block of] Texas Avenue, Southeast" and stated that he was "headed toward Ridge Road." An updated transmission from an officer in the area indicated that the

---

[3] The radio transmission was played by defense counsel during her cross-examination of Officer Sanchez and was labeled as Defense Exhibit 1. Although counsel did not formally move to have the exhibit admitted into evidence, she repeatedly referred to the exhibit during her suppression argument, and the trial court, without objection from the defense or the government, referred to the transmission as being "in[] evidence." We therefore consider and treat it as evidence.

Neither party in this appeal submitted a copy of Defense Exhibit 1 for this court's review. *See In re CA.S.*, 828 A.2d 184, 192 (D.C. 2003) ("The duty to provide an adequate record is primarily on the appellant, but an appellee also has a duty to insure an adequate record so the judgment in the latter's favor may be upheld." (internal quotation marks and citation omitted)). And while the initial order in this appeal required trial counsel to "transmit all documents pertaining to this appeal, including trial exhibits[,] to the newly appointed [appellate] counsel," Order, Apr. 23, 2015, Mr. Miles's appellate counsel was unable to provide the exhibit when this court asked him for it. The government eventually was able to provide a substitute: a two-and-a-half-hour recording of MPD transmissions from the morning of the events in this case. It appears, upon comparison with the suppression-hearing transcript, that approximately the first three and a half minutes of this recording comprise Defense Exhibit 1, so we limit our consideration to that portion of the recording.

subject was "in the 4800 block of . . . Alabama Avenue."[4] Officer Sanchez, who was alone in his car, testified that he drove to the intersection of Alabama and F Streets, where he observed a man, Everett Miles, who "matched the description" from the transmission—that is, according to the officer, Mr. Miles appeared to be wearing an Army-type "camouflage jacket."[5] Officer Sanchez also saw another MPD officer, Demond James, "walking behind" Mr. Miles and "point[ing] at him like that's him." According to Officer Sanchez, Officer James was between twenty and twenty-five feet behind Mr. Miles, who was the "only person on the street at all" that morning.

As Mr. Miles was walking south in the 4900 block of Alabama Avenue, Officer Sanchez parked his car "[r]ight on F [Street] and the corner," "blocking the sidewalk [Mr. Miles] was walking on to conduct a stop."[6] Officer Sanchez

---

[4] Officer Sanchez said that this block of Alabama Avenue is "close to the location on Texas Avenue."

[5] A photograph of Mr. Miles wearing the jacket was admitted into evidence. On cross-examination, Officer Sanchez, examining the jacket as it appeared in the photo, testified that "[f]rom far away [he saw] dark blue [but] right[] now it's gray, dark gray."

[6] Officer Sanchez did not provide any further details about what he meant when he said he "block[ed] the sidewalk," but Officer Davis later testified at trial—repeatedly and without contradiction—that Officer Sanchez "literally . . . drove right onto the sidewalk."

testified that when he "slightly got out of the car" and asked Mr. Miles to stop, Mr. Miles "ran to his left to the back of [the] cruiser towards F Street." After briefly pursuing Mr. Miles on foot, Officer Sanchez detained him in the middle of the intersection, "grabb[ing] his waistband from his back." Officer Sanchez testified that he "felt a hard object on the right front side of his waistband," an object that "felt like a gun." Officer Sanchez "called out gun" to the other officers on the scene—Officer James and Officer Davis—while attempting to hold Mr. Miles's hands up to prevent him from reaching for the weapon. Officer Davis then retrieved the gun from the right front side of Mr. Miles's waistband.

Officer Davis herself testified that she was on patrol when she heard a radio transmission for a man who was wearing an Army jacket and carrying a gun near Texas Avenue. While driving toward that location, Officer Davis "saw a subject fitting the description" from the radio transmission—a "black male with an Army print jacket" that was "dark colored." Shown a photo of Mr. Miles wearing the jacket on cross-examination,[7] Officer Davis testified that it "look[ed] a little green, a little tan," but that the picture seemed "distorted." According to Officer Davis, Mr. Miles was walking along the 4800 block of Alabama Avenue when she first saw him, and there were no other people on the street.

---

[7] See *supra* note 5.

According to Officer Davis, she initially drove past Mr. Miles to inform Officer James, who was parked at the end of the block, that she thought she had spotted the subject described in the radio transmission. The two officers drove in Mr. Miles's direction, and Officer James exited his vehicle after Mr. Miles "refused to stop and started running." Officer Davis testified that Officer Sanchez then pulled in front of her car and eventually stopped the fleeing Mr. Miles on foot. In Officer Davis's recollection, Officer Sanchez, in tussling with Mr. Miles, said "[g]un, gun, gun" while trying to hold Mr. Miles's hands over his head. Officer Davis testified that she saw the handle of the gun in Mr. Miles's front waistband and grabbed the weapon.

At the conclusion of the suppression hearing the court made the following findings. At about 8:08 a.m. on March 24, 2013, the MPD dispatcher "received a call from an unidentified citizen who indicated that there was a man with a gun" on the 4500 block of Texas Avenue, Southeast. According to the radio transmission, the subject was a "black male" "wearing a blue Army-type jacket." A few minutes later, the subject was found "within a couple of blocks" of the original location "wearing a jacket that matched in the officer's mind the description provided by the dispatcher." Examining the photo introduced into evidence, the court found that the jacket seemed "mostly gray but [with] a bluish tint of the gray." After noting Officer Davis's testimony that the color in the photo was distorted,

however, the court found that on the morning of the stop, "the jacket that Mr. Miles was wearing" appeared to be "a blue Army-type jacket." The court also found that Mr. Miles "took off running" when "Officer Sanchez asked Mr. Miles to stop so that Sanchez could investigate further."[8] The court found that Mr. Miles's flight reflected "consciousness of guilt on his part."

In denying Mr. Miles's suppression motion, the trial court concluded that the "running by itself would not be sufficient but running coupled with the fact that he . . . match[ed] the description of the individual who was seen with the gun" is "more than sufficient to establish reasonable articulable suspicion and allow the officers to detain Mr. Miles in the way that they did."

## II.

Mr. Miles argues that the police lacked reasonable articulable suspicion to stop him and that the trial court therefore erred in denying his motion to suppress. In reviewing the trial court's denial of a motion to suppress, "we defer to the trial

---

[8] At one point the court stated that "Mr. Miles . . . t[ook] off running, as soon as . . . contact was made *by the officers*" (emphasis added). Although on appeal Mr. Miles characterizes this finding as being in tension with the court's finding that Mr. Miles fled after *Officer Sanchez* told him to stop, the latter finding (referring to Officer Sanchez) is just more precise than the former (referring generally to "the officers").

court's findings of evidentiary fact unless clearly erroneous, and we view those facts, and the reasonable inferences that stem from them, in the light most favorable to the government." *Sharp v. United States*, 132 A.3d 161, 166 (D.C. 2016). We review de novo the trial court's ultimate legal conclusion that the police had reasonable suspicion to stop Mr. Miles.[9] *See id.*

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons"—so-called *Terry* stops—"that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Accordingly, such a stop is lawful only if "the detaining officers . . . have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). While the level of suspicion that is required

---

[9] Put another way, "[t]he trial court's factual findings about the circumstances surrounding [a defendant's] encounter with the police are entitled to deference," but "[t]he legal import of the circumstances is a question of law for our own independent determination." *United States v. Turner*, 699 A.2d 1125, 1127 (D.C. 1997). While consciousness of guilt can be a historical fact when viewed as a mental state, we are concerned here with the trial court's finding regarding the legal import of the circumstances of Mr. Miles's flight, which focuses upon the legal question whether an objectively reasonable officer would infer that Mr. Miles's conduct reflected consciousness of guilt—and would thus, based upon that and other information, reasonably suspect that Mr. Miles had a gun. *See Ornelas v. United States*, 517 U.S. 690, 696, 699 (1996); *Pridgen v. United States*, 134 A.3d 297, 300 (D.C. 2016).

is "considerably less than proof of wrongdoing by a preponderance of the evidence," *United States v. Sokolow*, 490 U.S. 1, 7 (1989), the Fourth Amendment "requires 'some minimal level of objective justification' for making the stop" and an officer "must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch."'" *Id.* (first quoting *INS v. Delgado*, 466 U.S. 210, 217 (1984), and then *Terry*, 392 U.S. at 27). The court considers various factors in deciding whether a *Terry* stop is justified. *See, e.g.*, *Bennett v. United States*, 26 A.3d 745, 753 (D.C. 2011) (listing factors such as time of day, flight, and an informant's tip). "Although each factor is useful in determining whether there were articulable facts justifying the stop, these factors 'are not elements of a conjunctive test,' and no one factor is 'outcome determinative.'" *Umanzor v. United States*, 803 A.2d 983, 993 (D.C. 2002) (quoting *In re D.A.D.*, 763 A.2d 1152, 1155 (D.C. 2000)). In other words, "we must consider 'the totality of the circumstances—the whole picture.'" *Sokolow*, 490 U.S. at 8 (quoting *Cortez*, 449 U.S. at 417).

"[C]ourts are properly wary of sustaining seizures on the basis of anonymous tips, and require a substantial measure of corroboration of information anonymously provided." *Brown v. United States*, 590 A.2d 1008, 1015 (D.C. 1991). To furnish reasonable suspicion, it is not enough that an anonymous tip alleges criminal activity and provides "[a]n accurate description of [the] subject's

readily observable location and appearance." *Florida v. J.L.*, 529 U.S. 266, 270 (2000). A tip that does nothing more than identify a suspect "does not show that the tipster has knowledge of concealed criminal activity." *Id.* at 272. Rather, for a tip to justify a *Terry* stop, there must be corroborating circumstances that show that the "tip [is] reliable in its assertion of illegality." *Id.*[10] This means that when, as in the present case, the police receive an anonymous tip alleging a subject's possession or use of a firearm, the police must typically "see[] something that confirm[s] the presence of a gun"—which is to say, something that corroborates the tip that there was a gun—before stopping the subject. *Plummer v. United States*, 983 A.2d 323, 333 (D.C. 2009); *cf. J.L.*, 529 U.S. at 268, 271 (holding that an anonymous tip "that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun" was not sufficiently corroborated by the

---

[10] The Supreme Court has not required such independent corroboration in all anonymous tip cases. In *Navarette v. California*, the Court approved a vehicle stop where an anonymous 911 caller reported that she had been "[run] . . . off the roadway" at a certain mile marker by a vehicle matching a certain description and where the police located the vehicle, down the road, in a location where it reasonably would have been given the lapse in time from the call. 134 S. Ct. 1683, 1687, 1689 (2014). The Court reasoned that "[b]y reporting that she had been run off the road by a specific vehicle[,] . . . the caller necessarily claimed eyewitness knowledge of the alleged dangerous driving." *Id.* at 1689. Moreover, the Court found that recent "technological and regulatory developments" involving the 911 system further improved the tip's reliability, noting that Federal Communications Commission regulations required telecommunications companies "to relay the caller's phone number to 911 dispatchers." *Id.* at 1689–90.

police's mere observation of three black males, one of whom was wearing a plaid shirt, at the bus stop).

Turning first to the tip's ability to identify a specific person, the two officers' testimony that Mr. Miles was the only person on the street where the officers spotted him mere minutes after the 911 call undoubtedly adds to its reliability in this regard.[11] The caller's description of the suspect in this case as a black male wearing a blue Army jacket had some shortcomings, however, and matched only weakly Mr. Miles's actual appearance. A photograph of Mr. Miles

---

[11] The dissent states that the officers' grounds for stopping Mr. Miles were further strengthened by evidence that someone approached one of the responding officers and told him that the suspect was going to be in the 4300 block of E Street. *Post* at 31. No witness at the suppression hearing mentioned this evidence, which comprised a seven-second snippet of the radio transmission that was played at the hearing. The dissent acknowledges that "this person's basis for knowledge is also unclear," *post* at 31, and there is no evidence that he or she was the same person who placed the 911 call. More fundamentally, this report alleged no criminality on the part of the "suspect," the government has not relied upon it as justification for the stop, and the trial court made no reference to it at all in its findings. The evidence could perhaps be viewed as establishing that Mr. Miles likely tracked the suspect's purported route "in the direction of Ridge Road," see *post* at 27, but it does not do that very well. As an initial matter, the report contained no description indicating that this "suspect" was the black male with a blue Army jacket initially reported to have a gun in the 4500 block of Texas Avenue. And if we accept Officer Sanchez's testimony that Mr. Miles was walking south on Alabama Avenue when officers confronted him at the intersection of Alabama and F Street, his presence in the 4300 block of E Street had him walking away from Texas Avenue's direct path to Ridge Road at that point. In any event, this evidence adds little if any weight to the reasonable suspicion calculus.

at the scene—which Officer Sanchez agreed was a fair and accurate representation of Mr. Miles at the time he was apprehended that morning—showed that Mr. Miles shared the race and gender of the alleged gunman, but the trial judge observed that Mr. Miles's jacket "could be criticized as a blue jacket" as it looked "mostly gray" in the photograph, albeit with a "bluish tint of the gray." Officer Sanchez likewise testified that "[f]rom far away" the jacket in the photograph looked "dark blue" but "right now it's gray, dark gray," while Officer Davis said it looked "a little green, a little tan." Nothwithstanding these discrepancies, the court found, after crediting Officer Davis's testimony that the photograph did *not* accurately depict the color of the jacket Mr. Miles was wearing that morning, that Mr. Miles's jacket appeared to the officers to be a "blue Army-type jacket" and that Mr. Miles thus matched the description provided in the call. In the end, any uncertainty on our part that the 911 call from the anonymous "concerned citizen" was "reliable . . . in its tendency to identify a determinate person," *J.L.*, 529 U.S. at 271, is averted by the trial court's finding—by no means clearly erroneous—that the image in the photograph was distorted. *See United States v. Turner*, 699 A.2d 1125, 1129 (D.C. 1997) ("[W]e have routinely held that an imperfect description, coupled with close spatial and temporal proximity between the reported crime and seizure, justifies a Terry stop").

The more difficult question, then, is whether there was sufficient corroborating evidence to allow the police to conclude that the tip was "reliable in its assertion of illegality" and thus to reasonably suspect that Mr. Miles was carrying a gun. *J.L.*, 529 U.S. at 272. This is not the rare type of case in which the substance of the anonymous tip obviates such independent corroboration, see *supra* note 10, and indeed the government states explicitly in its brief that it is not arguing "that the anonymous 911 call was a sufficient basis, by itself, for the stop." Appellee's Br. 24. Unlike in *Jackson v. United States*, 109 A.3d 1105, 1106, 1109 (D.C. 2015), where the caller said she had personally seen the suspect take a gun out of his pocket and it "scared the hell out of [her]," the tip here did not indicate that the caller necessarily had observed a crime, and the government accordingly has not portrayed it that way.[12]

---

[12] While the dissent, relying on *Navarette*, asserts that the traceability of 911 calls permits an officer to reasonably infer that an anonymous tip called into a 911 line is reliable, there is affirmative evidence in the record that the 911 system here did not work in the way that gave the *Navarette* Court confidence in the 911 system's ability to discourage dishonest tipsters. See *supra* note 10 (discussing *Navarette v. California*, 134 S. Ct. at 1689–90); *cf. Jackson*, 109 A.3d at 1107 (finding a mere "record gap" concerning the 911 system to be an insufficient basis to distinguish *Navarette*). Specifically, in the recording played at the suppression hearing, the dispatcher twice indicated that she did not have a "callback number" for the anonymous caller. Even if, as the dissent notes, "a reasonable officer could conclude that a false tipster would think twice before" calling 911, *post* at 29 (quoting *Navarette*, 134 S. Ct. at 1689–90), the caller's apparent intention to

(continued…)

The only material corroborating circumstance was thus Mr. Miles's flight from the police. The touchstone case on the relevance of a suspect's flight in the reasonable suspicion analysis is *Illinois v. Wardlow*, 528 U.S. 119 (2000). In that case, the Supreme Court held that the defendant's "presence in an area of heavy narcotics trafficking," combined with the defendant's "unprovoked flight upon noticing the police," provided a sufficient basis for the police to conduct a *Terry* stop. *Id.* at 124. In support of this holding, the Court cited precedent recognizing that "the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis," *id.* (citing *Adams v. Williams*, 407 U.S. 143, 144, 147–48 (1972)), and the Court further reasoned that "[h]eadlong flight," which it called "the consummate act of evasion," is "not necessarily indicative of wrongdoing" but is "certainly suggestive of such," *id.* And although the Supreme Court's reasoning focused only upon these two factors, *Henson v. United States*, 55 A.3d 859, 868 (D.C. 2012); *Wilson v. United States*, 802 A.2d 367, 371 (D.C. 2002), the totality of the circumstances in *Wardlow* also included the fact, mentioned in the Supreme Court's opinion, that when police first saw Mr.

---

(…continued)
remain anonymous and not provide a callback number tends to support the opposite inference—that *this* caller was not aware the call could be traced.

Wardlow, he was "holding an opaque bag"—the same bag in which police soon thereafter found an illegal handgun. 528 U.S. at 122.

*Wardlow* is factually quite distinguishable from the present case—the most obvious differences being that the defendant in *Wardlow* was present in a high-narcotics-trafficking area and that there was no anonymous tip in that case. And in keeping with the Supreme Court's reminder that the "words of [its] opinions are to be read in the light of the facts of the order under discussion," *Armour & Co. v. Wantock*, 323 U.S. 126, 132–33 (1944), some courts, including this one, have also relied upon the opaque bag as a basis for distinguishing *Wardlow* from comparable situations.[13] *See Gordon v. United States*, 120 A.3d 73, 84 (D.C. 2015) (noting that "the accosting officers [in *Wardlow*] observed more than flight; they saw the

---

[13] *See also Kraft v. Kraft*, 155 A.2d 910, 913 (D.C. 1959) ("It is well to remember that significance is given to broad and general statements of the law only by comparing the facts from which they arise with those facts to which they supposedly apply."); *Umana v. Swidler & Berlin, Chartered*, 669 A.2d 717, 719 (D.C. 1995) ("In determining the scope of our prior holdings, it is important that we examine the contexts in which they were made."). The Supreme Court's reminder makes it difficult to conclude that any court making a reasonable-suspicion determination would have come to precisely the same rule, identically worded and without caveats, if a discernibly relevant fact were not in the mix of "the whole picture." *Sokolow*, 490 U.S. at 8. Here, the relevance of the opaque bag amid the totality of facts in *Wardlow* is borne out by the government's own view, as argued in its brief to the Supreme Court, that "the fact that [Mr. Wardlow] was holding a bag under his arm provides further objective manifestation that he was engaged or was about to engage in illegal activity." Brief for Petitioner at 43, *Illinois v. Wardlow*, 528 U.S. 119 (2000) (No. 98-1036), 1999 WL 451857.

suspect 'holding an opaque bag' in 'an area known for heavy narcotics trafficking'") (quoting *Wardlow*, 528 U.S. at 121–22); *United States v. Navedo*, 694 F.3d 463, 471 (3d Cir. 2012) (noting that Wardlow was "holding an opaque bag" when police saw him and stating that because police "had every reason to believe that the people assembled on the sidewalk included drug dealers and their customers, Wardlow's flight '*in this context*,' would certainly give rise to a reasonable suspicion that he was fleeing because of what was in the bag" (quoting *Wardlow*, 528 U.S. at 124)).

While *Wardlow* is not directly controlling here, the case makes clear that a defendant's flight can be a relevant factor in the reasonable suspicion analysis. At the same time, as Justice Stevens pointed out in his partial concurrence and dissent, the Court in *Wardlow* stopped short of endorsing "the proposition that 'flight is . . . necessarily indicative of ongoing criminal activity,'" and "adher[ed] to the view that '[t]he concept of reasonable suspicion . . . is not readily, or even usefully, reduced to a neat set of legal rules,' but must be determined by looking to 'the totality of the circumstances.'" *Id.* at 126 (Stevens, J., concurring in part and dissenting in part) (quoting *Sokolow*, 490 U.S. at 7–8) (ellipses and second set of brackets in original; internal cross-reference omitted). The Supreme Court has since emphasized on multiple occasions the fact-intensive and context-dependent nature of the reasonable suspicion analysis. *See, e.g.*, *Navarette v. California*, 134

S. Ct. 1683, 1687 (2014); *Missouri v. McNeely*, 133 S. Ct. 1552, 1564 (2013); *Arvizu*, 534 U.S. at 273–74.

Our court, too, has made clear that "flight cannot imply consciousness of guilt in all cases." *Duhart v. United States*, 589 A.2d 895, 900 (D.C. 1991) (quoting *Smith v. United States*, 558 A.2d 312, 316 (D.C. 1989) (en banc)); *accord Pridgen v. United States*, 134 A.3d 297, 303 n.17 (D.C. 2016); *see also Alberty v. United States*, 162 U.S. 499, 511 (1896) ("Nor is it true as an accepted axiom of criminal law that 'the wicked flee when no man pursueth, but the righteous are as bold as a lion.'"). There are myriad reasons an innocent person might run away from the police. In *In re D.J.*, we explained that "[a]n individual may be motivated to avoid the police by a natural fear or dislike of authority, a distaste for police officers based upon past experience, an exaggerated fear of police brutality or harassment, a fear of being apprehended as the guilty party, or other legitimate personal reasons." 532 A.2d 138, 142 n.4 (D.C. 1987); *accord Wardlow*, 528 U.S. at 132–35 (Stevens, J., concurring in part and dissenting in part). As to this "fear of police brutality," Mr. Miles states in his brief that "the proliferation of visually documented police shootings of African-Americans that has generated the Black Lives Matter protests" suggests that the court was misinformed in *In re D.J.* when

it characterized such fear as "exaggerated."[14]  Appellant's Br. 33 (citing Richard

Pérez-Peña, *Fatal Police Shootings:  Accounts Since Ferguson*, N.Y. Times, Apr.

---

[14]  One state supreme court has bluntly addressed the effect of racial disparities in police encounters on the assessment of consciousness of guilt.  In *Commonwealth v. Warren*, 58 N.E.3d 333 (Mass. 2016), the Supreme Judicial Court of Massachusetts, relying on a study's finding "that black males in Boston are disproportionately and repeatedly targeted for [investigatory] encounters," recently held that the flight at issue in that case "added nothing to the reasonable suspicion calculus" in part because this report "suggest[ed] a reason for flight totally unrelated to consciousness of guilt"—namely, "to avoid the recurring indignity of being racially profiled."  *Id.* at 342.  A body of similar research suggests that an African-American man (like Mr. Miles) is statistically more likely to have police force used against him than members of other racial groups.  *See* Gov't of the D.C. Police Complaints Bd., Office of Police Complaints, Report on Use of Force by the Washington, D.C. Metropolitan Police Department (2017), https://policecomplaints.dc.gov/sites/default/files/dc/sites/office%20of%20police%20complaints/publication/attachments/UOF%2017%20Final.pdf.18 (reporting that 48% of District of Columbia residents are black and 47% are male, but black community members were the subjects of about 90% of reported uses of force and males were the subjects of 80 to 90% of reported uses of force); Timothy Williams, *Study Supports Suspicion That Police Are More Likely to Use Force on Blacks*, N.Y. Times, July 7, 2016, http://www.nytimes.com/2016/07/08/us/study-supports-suspicion-that-police-use-of-force-is-more-likely-for-blacks.html (summarizing a study examining "more than 19,000 use-of-force incidents by police officers representing 11 large and midsize cities and one large urban county" and finding that "the use of police force is disproportionately high for African-Americans— more than three times greater than for whites"); Roland G. Fryer, Jr., *An Empirical Analysis of Racial Differences in Police Use of Force* 3 (Nat'l Bureau of Econ. Research, Working Paper No. 22399, 2016), http://www.nber.org/papers/w22399 ("[B]lacks and Hispanics are more than fifty percent more likely to have an interaction with police which involves any use of force."); Christine Eith & Matthew R. Durose, Dep't of Justice, Bureau of Justice Statistics, *Contacts Between Police and the Public, 2008*, at 12 (2011), https://www.bjs.gov/content/pub/pdf/cpp08.pdf (reporting statistics indicating that "[m]ales were more likely than females to have force used or threatened against them during their most recent contact with the police" and that "[b]lacks were

(continued…)

8, 2015, http://www.nytimes.com/interactive/2015/04/08/us/fatal-police-shooting-accounts.html ("[I]n the year since an officer fatally shot Michael Brown . . . 1,000 or more people died at the hands of law enforcement officers . . . . That review reveals some expected patterns, like the disproportionate presence of African-Americans, people with mental illnesses, and young men among the dead.")). In any event, an investigatory stop and frisk is not a "petty indignity"—"[i]t is a serious intrusion upon the sanctity of the person," *Terry*, 392 U.S. at 16–17—and though we lack adequate empirical grounds for fathoming the extent to which innocent people might flee to avoid being subjected to one, it seems safe to say that the number is not insignificant. The critical question, therefore, is whether the principles discussed in *Wardlow* support a conclusion that Mr. Miles's flight—under the circumstances of this case—sufficiently corroborated the anonymous tip

---

(…continued)
more likely than whites or Hispanics to experience use or threat of force"); *cf.* Wash. Lawyers' Comm. for Civil Rights & Urban Affairs, *Racial Disparities in Arrests in the District of Columbia, 2009-2011* (2013), http://www.washlaw.org/pdf/wlc_report _racial_disparities.pdf (reporting statistics indicating a significant disparity in the arrest rates of African-Americans and whites). Researchers also have documented "wide racial gaps" in the public's perception of the police. Rich Morin & Renee Stepler, *The Racial Confidence Gap in Police Performance*, Pew Research Center (Sept. 29, 2016), http://www.pewsocialtrends.org/2016/09/29/the-racial-confidence-gap-in-police-performance/ ("Only about a third of blacks but roughly three-quarters of whites say police in their communities do an excellent or good job in using the appropriate force on suspects, treating all racial and ethnic minorities equally and holding officers accountable when misconduct occurs.").

to show that it was reliable in its assertion of illegality and accordingly to allow the police to conduct an investigatory stop.[15]

We conclude that the answer to this question is no. The *Wardlow* defendant's flight was probative of guilt because it was "unprovoked." 528 U.S. at 124; *see also id.* at 125 ("[U]nprovoked flight is simply not a mere refusal to cooperate."). The defendant was standing on the side of the street and fled when he saw a "caravan" of four police vehicles "pass[ing]" by. *Id.* at 121–22. Mr. Miles's flight, in contrast, was not "unprovoked" in the same way.[16] As Officer

---

[15] Alternatively, because both *Wardlow* and the present case involve a defendant's flight and differ primarily in that the present case involves an anonymous tip while *Wardlow* involved a high-crime area and a defendant holding an opaque bag, we could attempt to determine whether there was reasonable suspicion in the present case by considering whether being the apparent subject of an anonymous tip is a circumstance at least as suspicious as being present in a high-narcotics-trafficking area while holding an opaque bag. But given the differences—both conspicuous and more subtle, see *infra*—between *Wardlow* and the present case, and specifically between the circumstances of the flight in each case, an abstract inquiry of this nature would be ill-considered. *See Gomez v. United States*, 597 A.2d 884, 889 (D.C. 1991) ("Each case turns on its particular facts, and 'case matching' is of limited utility in Fourth Amendment analysis . . . ."); *see also Arvizu*, 534 U.S. at 273–74 ("[W]e have deliberately avoided reducing [the reasonable-suspicion analysis] to 'a neat set of legal rules.'" (quoting *Ornelas v. United States*, 517 U.S. 690, 695–696 (1996))).

[16] The government contends that because Mr. Miles failed to argue at the suppression hearing that his flight was provoked and then testified at trial that he did not flee from the officers at all, he cannot argue on appeal that the officers' provocative actions undermined the extent to which his flight evinced consciousness of guilt. We disagree. Mr. Miles clearly contended in the trial court

(continued…)

Sanchez described it in testimony credited by the trial court, Mr. Miles fled after

Officer Sanchez pulled his police cruiser in front of Mr. Miles as he was walking,

blocking off his path. Officer Sanchez "literally . . . drove right onto the

sidewalk," according to Officer Davis's undisputed trial testimony.[17] Officer

---

(…continued)
that the police lacked reasonable suspicion to stop him. His failure to argue provocation boiled down to a failure to highlight certain facts that made his conduct less suspicious. This omission did not prejudice the government, as the prosecutor had every incentive to try to establish that Mr. Miles's flight was unprovoked and in fact stated repeatedly in her argument on the motion that the testimony demonstrated that his flight was not provoked. *See West v. United States*, 710 A.2d 866, 868 n.3 (D.C. 1998) (quoting *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992)) ("[O]nce a . . . claim is properly presented, a party can make any argument in support of that claim."). We also see no basis for concluding that Mr. Miles's trial testimony denying that he fled at all—testimony that the motions court did not consider and that the trial court was not required to credit—somehow waived his right to argue on appeal that his flight was provoked. Moreover, because we view the events leading up to the stop from the standpoint of an objectively reasonable police officer, *see Ornelas*, 517 U.S. at 696, Mr. Miles's subjective description of his actions at trial was not inescapably at odds with his contention that the suppression hearing evidence failed to establish reasonable suspicion.

[17] *See Armstrong v. United States*, 164 A.3d 102, 106 n.7 (D.C. 2017) ("'Undisputed trial testimony' may be considered in determining whether error was committed in ruling on a pretrial motion to suppress." (quoting *West v. United States*, 604 A.2d 422, 427 (D.C. 1992)) (emphasis omitted)); *Rose v. United States*, 629 A.2d 526, 531 (D.C. 1993). The government agrees in its brief that we may consider undisputed trial testimony, and by characterizing as "undisputed" Officer James's trial testimony "support[ing] Officer Sanchez's testimony that appellant did not begin running until Officer Sanchez blocked his path," it further suggests, and we agree, that Officer Davis's "sidewalk" testimony is an undisputed clarification of Officer Sanchez's less pointed suppression hearing testimony. The dissent takes a different view, stating that we should not consider this testimony

(continued…)

Sanchez then got out of the vehicle and told Mr. Miles to "stop"; before that, Officer James was walking behind Mr. Miles. Regardless of whether Officer Sanchez's maneuver was a "reckless" or "rogue tactic," as Mr. Miles calls it in his brief, the experience of being followed by a police officer on foot, blocked by a police cruiser, and then told to "stop" would be startling and possibly frightening to many reasonable people. There was thus a reason other than consciousness of guilt for Mr. Miles to have fled. *See State v. Benton*, 43 A.3d 619, 628 (Conn.

---

(…continued)

because it is part of a "patchwork version of the facts" that no single witness testified to and that some testimony contradicted. *Post* at 37. But one witness—Officer Sanchez himself—did furnish the heart of the provocation narrative with his testimony that he "block[ed] the sidewalk" Mr. Miles was walking on and that Mr. Miles ran when he started to emerge from the car and told Mr. Miles to stop. The trial court specifically credited the officer's testimony in its finding that Mr. Miles "took off running" after Officer Sanchez pulled up and asked him to stop (contrary to Officer Davis's testimony that Mr. Miles started running *before* Officer Sanchez ordered him to stop). The only pivotal fact corroborative of provocation that was missing from Officer Sanchez's testimony was the additional detail that emerged at trial that when the officer blocked the sidewalk Mr. Miles was walking on, he drove up onto the actual sidewalk. No one balked at this amplification of Officer Sanchez's suppression hearing testimony, and on appeal, the government—which at the suppression hearing had every incentive to argue, and *did* argue, that Mr. Miles's flight, like the flight in *Wardlow*, was unprovoked—continues to treat the trial and suppression hearing characterizations as synonymous. Thus, in the section of its brief setting forth the evidence at the suppression hearing, the government characterizes Officer Sanchez's testimony like this: "Officer Sanchez parked his patrol car *on the sidewalk* at the street corner in front of appellant." (emphasis added). However one describes it, Officer Sanchez's act of cutting Mr. Miles off with his car was a surprising and intimidating move that was in any event more provocative than what happened in *Wardlow*.

2012) (explaining that "the judicial concern over provoked flight . . . pertains to situations in which police have engaged in the sort of provocative conduct that could cause a reasonable individual to take flight for reasons other than criminal culpability"); *cf. Pridgen*, 134 A.3d at 303 & n.17 (declining to focus the reasonable suspicion analysis on the defendant's flight, and instead focusing on what the defendant "did as he ran," because "a suspect's flight at the sight of officers who are targeting him with a flashlight may provide a basis for fear of harm that has nothing to do with whether the suspect is engaged in criminal activity").[18]

Moreover, unlike the cases cited in the government's brief in which we have found reasonable suspicion, there was nothing about the character of Mr. Miles's flight that seemed particularly incriminating. *Cf. Pridgen*, 134 A.3d at 303 & n.17.

---

[18] Courts addressing whether a defendant's flight was provoked have tended to focus on whether the police engaged in "unlawful[]" or "improper[]" behavior. *United States v. Franklin*, 323 F.3d 1298, 1302 (11th Cir. 2003); *State v. Harbison*, 156 P.3d 30, 37 (N.M. 2007). Indeed, this court has indicated that such behavior constitutes prototypical provocation. *See Henson*, 55 A.3d at 869 (suggesting that a suspect might reasonably flee from police officers using "excessive force" or who approach the suspect wearing masks). But given that the key question is whether the defendant's flight is probative of his or her participation in criminal activity, it would be a mistake to focus entirely on the propriety of the police officers' conduct. To do so would be to assume that all or most flight from police is motivated by either consciousness of guilt or immediate police misconduct—and nothing else.

In *Dalton v. United States*, for example, the suspect not only fled from the police without provocation[19] but "abandon[ed]" his "bicycle in the street." 58 A.3d 1005, 1013 (D.C. 2013). That the suspect went to such lengths—abandoning substantial property—to escape the police arguably suggested that the suspect was not fleeing due to a mere fear of the police or an ordinary desire to avoid police contact but was instead fleeing because he was guilty of a crime. *See also Coghill v. United States*, 982 A.2d 802, 808 (D.C. 2009) (the defendant fled a traffic stop, abandoning his companions and their vehicle, after the police had cuffed the driver, who himself had tried to escape by driving the car away from the stop).[20] In other jurisdictions, a number of appellate courts wrestling with consciousness-of-

---

[19] The police officers in *Dalton* were on patrol and there is no indication in the opinion that they were targeting the defendant. 58 A.3d at 1008–09. Nonetheless, the defendant spontaneously fled from them. *See id.* The defendant argued on appeal that the police had unlawfully seized him by "rapidly pursuing him on their bicycles," *id.* at 1012–13, but we rejected this argument and never accepted the premise that the police had been "rapidly pursuing him," *see id.*

[20] The present case is also not like *Wilson v. United States*, 802 A.2d 367 (D.C. 2002), another case the government cites. That case involved a *Wardlow*-like scenario: The defendant was spotted in an area "characterized by 'a high level' of narcotics activity," and when he saw the police, he walked away quickly and began "banging on [an apartment] door frantically." *Id.* at 368. Further, before the defendant tried to evade the police, he was with a person who "matched the description of [a] witness [the police were] looking for." *Id.* The present case lacks the factual similarity with *Wardlow* that *Wilson* has, and, as explained above, under the circumstances the flight in the present case was not substantially indicative of criminal activity.

guilt issues in the wake of *Wardlow* have found evidence of reasonable suspicion to be lacking in circumstances involving an anonymous tip and various acts of avoidance or more overt flight. *See, e.g.*, *T.P. v. State*, 224 So. 3d 792, 795 (Fla. Dist. Ct. App. 2017) (holding that police lacked reasonable suspicion to stop T.P. where an unidentified 911 caller gave a vague description of a light-skinned black male wearing shorts and a shirt looking through windows of houses, officers saw a man matching the description a quarter of a mile away, and T.P. ran when police asked him to stop); *United States v. Freeman*, 735 F.3d 92, 101 n.1 (2d Cir. 2013) (holding that, even accepting testimony that Mr. Freeman walked away in an aggressive manner—which one witness described as having "ripped" his arms away—police lacked reasonable suspicion where within minutes of responding to an unidentified 911 caller's report of "a person possibly armed with a firearm" and "arguing with a female," police observed Mr. Freeman, who matched the reported description and location, and Mr. Freeman then "shrugged" off one officer who put his hand on his elbow, shrugged off another who grabbed his elbow, and kept walking); *United States v Lowe*, 791 F.3d 424, 435 (3d Cir. 2015) (holding that police lacked reasonable suspicion where police received an anonymous call regarding a man with a gun in a high crime area that was also the site of a recently reported gunshot and where a man matching the description refused to show his hands to police and took several steps backing away as police approached); *Lee v.*

*State*, 868 So. 2d 577, 581–82 (Fla. Dist. Ct. App. 2004) (holding that police lacked reasonable suspicion where they responded to an anonymous tip that several black males were selling drugs at a certain location, where police arrived to find five black males on the corner, and where Mr. Lee walked away quickly upon observing the approaching police car).

Because Mr. Miles's flight was not "unprovoked" to the same extent as the defendant's flight in *Wardlow*, and because there are no circumstances—beyond the flight itself—that cast an incriminating light on Mr. Miles's flight, we conclude that Mr. Miles's flight does not sufficiently corroborate the 911 call. Although we recognize that "we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists," *Wardlow*, 528 U.S. at 124–25, and although we thus consider this to be a close case, Mr. Miles's flight was too equivocal to reasonably corroborate the anonymous tip that the man had a gun.

## III.

For the foregoing reasons, we conclude that the police lacked reasonable suspicion to subject Mr. Miles to a *Terry* stop. We therefore reverse Mr. Miles's convictions and remand for such further proceedings as are appropriate.

*So ordered.*

MCLEESE, *Associate Judge*, dissenting:  The court holds that the police officers in this case lacked reasonable articulable suspicion to stop Mr. Miles.  I respectfully dissent.

**I.**

We view the evidence at the suppression hearing in the light most favorable to the trial court's ruling.  *United States v. Lewis*, 147 A.3d 236, 239 (D.C. 2016) (en banc).  So viewed, the evidence indicated the following.  At 8:08 a.m. on March 24, 2013, a 911 caller reported that a man "is shooting a gun" in the air in the 4500 block of Texas Avenue SE and "is heading towards Ridge Road."  The 911 caller, who did not provide a name or callback number, described the shooter as a black male wearing a blue army jacket.  Police officers were dispatched to the area to look for the shooter.  Within a couple of minutes, someone stopped one of the officers and stated that "the suspect" was going to be in the 4300 block of E Street, which is about a block or two away from the originally indicated location, in the direction of Ridge Road.  It is unclear whether the person who stopped the officer was the 911 caller or someone else.  Less than a minute later, a different officer reported that a man was running in the 4300 block of F Street.  Officers stopped that man, who was Mr. Miles, within a minute of that report.

Two officers testified at the suppression hearing about the stop of Mr. Miles. Officer Juan Sanchez testified that he first saw Mr. Miles near the intersection of Alabama Avenue and F Street. (That intersection falls within the 4300 block of F Street.) Mr. Miles matched the description of the shooter, and Officer Sanchez did not see anyone else who matched that description. Officer Sanchez noticed that another officer, Officer Demond James, was walking about twenty to twenty-five feet behind Mr. Miles, pointing at Mr. Miles. Officer Sanchez parked his police cruiser around the corner of F Street and Alabama Avenue, blocking the sidewalk on which Mr. Miles was walking. Officer Sanchez started getting out of his cruiser and asked Mr. Miles to stop. Mr. Miles then ran in the direction of F Street. After a brief chase, Officer Sanchez grabbed Mr. Miles. While stopping Mr. Miles, Officer Sanchez felt a hard object in Mr. Miles's waistband. Other officers came to assist, and one of them recovered a gun from Mr. Miles's waistband.

Officer Shalonda Davis testified that she first saw Mr. Miles in the 4800 block of Alabama Avenue. Mr. Miles matched the description of the shooter, and Officer Davis did not see anyone else who matched that description. Officer Davis drove past Mr. Miles and enlisted the assistance of Officer James. They drove back towards Mr. Miles, who "refused to stop and started running." Officer Davis sped up to try to stop Mr. Miles, but Officer Sanchez pulled in front of her. Officer Sanchez then stopped Mr. Miles.

The trial court denied Mr. Miles's motion to suppress, concluding that the officers had reasonable articulable suspicion. With respect to the circumstances of the stop, the trial court indicated that Mr. Miles started running after Officer Sanchez asked Mr. Miles to stop.

## II.

In my view, the trial court correctly held that the officers had reasonable articulable suspicion to stop Mr. Miles.

First, the police had received a 911 call stating that a man "is shooting a gun" in the air. Although the 911 caller did not provide a name or callback number, the Supreme Court has held that "a reasonable officer could conclude that a false tipster would think twice before" calling 911, given that 911 calls "allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity." *Navarette v. California*, 134 S. Ct. 1683, 1689–90 (2014). The caller's use of the 911 system thus is an "indicator of veracity." *Id.* at 1689. The opinion for the court suggests, however, that either (1) the 911 system in this case "did not work in the way" the 911 system operated in *Navarette* or (2) the 911 caller in this case "inten[ded] to remain anonymous and not provide a callback number." *Ante* at 13 n.12. Those suggestions are entirely speculative,

and it might well be that instead the 911 operator (quite reasonably) did not attempt to ascertain the 911 caller's number while in the midst of dispatching officers to respond to a call about a man shooting a gun. The contrary speculation of the opinion for the court is incompatible with our acknowledged obligation to view the evidence in the light most favorable to the trial court's ruling. *Ante* at 7–8. In any event, the question is not whether the 911 operator in fact would have been able to trace this particular 911 call, or even whether the District's 911 system generally is able to trace 911 calls. Rather, the question is whether "a reasonable officer could conclude that a false tipster would think twice before" calling 911. *Navarette*, 134 S. Ct. at 1690. We have already held that the absence of evidence about the particular capabilities of the District's 911 system does not undermine the reasonableness of that conclusion. *Jackson v. United States*, 109 A.3d 1105, 1108 (D.C. 2015).

Second, the 911 call supported "an inference that the information was based on personal observation." *Goldston v. United States*, 562 A.2d 96, 101 (D.C. 1989). Specifically, the 911 caller (1) used the present tense to describe conduct -- shooting a gun in the air -- that would be both visible and very audible, *cf., e.g.*, *Beckner v. Commonwealth*, 425 S.E.2d 530, 533 (Va. Ct. App. 1993) ("[I]mplications of a personal basis of knowledge may arise when an individual reports that a person . . . 'is displaying a gun.'"); and (2) specifically described the

shooter and the shooter's direction of travel, *see, e.g.*, *State v. Sousa*, 855 A.2d 1284, 1290 (N.H. 2004) (weight to be given to anonymous tip depends among other things on whether "tip is sufficiently detailed to permit the reasonable inference that the tipster has actually witnessed" offense). *Cf. generally, e.g.*, *Porter v. United States*, 7 A.3d 1021, 1025 (D.C. 2010) ("[I]f an informant's report contains detailed, current information, it is probably based on first-hand perception . . . .") (internal quotation marks omitted).

Third, someone approached one of the officers and provided further information about where to find the suspect. It is unclear whether this person was the 911 caller or a different person, and this person's basis for knowledge is also unclear. Notwithstanding these limitations, this face-to-face report added to the officers' grounds for stopping Mr. Miles. *See, e.g.*, *Nixon v. United States*, 870 A.2d 100, 105 (D.C. 2005) ("Information conveyed to the police by such in-person informants, even if they do not reveal their names, is not subject to the same scrutiny as purely anonymous tips. [T]he fact that the tip was given in person, rather than over the telephone, further strengthens its credibility.") (citation and internal quotation marks omitted); *United States v. Spotts*, 275 F.3d 714, 722 (8th Cir. 2002) (giving weight to existence of "multiple sources of suspicion").

Fourth, police officers promptly corroborated innocent details of the 911 caller's information. They found Mr. Miles, who matched the 911 caller's description, where he would have been expected to be based on the 911 caller's information about the shooter's location and direction of travel, and they saw no one else who matched that description. *See, e.g.*, *Green v. United States*, 974 A.2d 248, 256 (D.C. 2009) (corroboration of innocent details, such as suspect's description, bolsters reliability of anonymous tip). Although the opinion for the court states at one point that the caller's description "matched only weakly Mr. Miles's actual appearance," *ante* at 11, that statement is puzzling given the court's acknowledgment that any concern about the accuracy of the description was "averted" by the trial court's factual finding that Mr. Miles matched the caller's description, *ante* at 12. See also *ante* at 7–8 (acknowledging that we defer to trial court's factual findings unless clearly erroneous).

Fifth, Mr. Miles fled after being asked to stop. *See, e.g.*, *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such.").

Taken together, these circumstances more than sufficed to establish the "minimal level of objective justification," *Wardlow*, 528 U.S. at 123, required to

permit the officers to stop Mr. Miles. *See generally, e.g.*, *Robinson v. United States*, 76 A.3d 329, 336 (D.C. 2013) ("The reasonable, articulable suspicion standard requires substantially less than probable cause and considerably less than proof of wrongdoing by a preponderance of the evidence. It is not onerous, but it is not toothless either. . . . Unparticularized suspicion and inarticulate hunches are not sufficient . . . .") (citations and internal quotation marks omitted). The Supreme Court, this court, and other courts have upheld stops based on circumstances that were equally or even less suspicious. *See, e.g.*, *Navarette*, 134 S. Ct. at 1686–92 (upholding stop based on anonymous 911 call that truck had run caller off road, where caller specifically described truck and officers later found truck where it would have been expected to be based on information provided by 911 caller); *Wardlow*, 528 U.S. at 121–26 (upholding stop based on suspect's unprovoked flight from police in high-crime area); *Jackson*, 109 A.3d at 1106–09 (upholding stop based on anonymous 911 call that caller had seen man with gun, where officers found suspect matching description given by caller in immediate area indicated by caller); *In re D.M.*, 781 A.2d 1161, 1162–65 (Pa. 2001) (upholding stop based on anonymous 911 call about man with gun, where officers found suspect who matched description provided by caller in area indicated by caller, and suspect fled after officer directed suspect to come over).[21]

---

[21] The opinion for the court suggests that *Wardlow*'s holding rested not only

(continued…)

Neither Mr. Miles nor the opinion for the court cites a single case from any court holding that police lacked reasonable articulable suspicion in circumstances comparable to those of the present case, and I am not aware of any such case. The opinion for the court does cite a few out-of-jurisdiction cases that it describes as "involving an anonymous tip and various acts of avoidance or more overt flight." *Ante* at 24–25. The opinion does not assert that the basis for suspicion in those

_____

(…continued)

on the suspect's flight in a high-crime area but also on the fact that the suspect had an opaque bag. *Ante* at 15–16. This court has correctly rejected that interpretation of *Wardlow*. *Wilson v. United States*, 802 A.2d 367, 371 (D.C. 2002) (fact that suspect was holding opaque bag "played no part" in Supreme Court's reasoning in *Wardlow*). The opinion for the Court in *Wardlow* did mention the opaque bag, but only in the fact section of its opinion, when describing the sequence of events that led to the discovery of the gun that Mr. Wardlow was convicted of unlawfully possessing. 528 U.S. at 122. When the Supreme Court explained the circumstances it relied upon to find the stop lawful, it made no mention of the opaque bag. *Id.* at 123–26. I do not think that the holding in *Wardlow* can reasonably be interpreted as resting on a fact that the Supreme Court did not mention in explaining the reasons for its holding. As the opinion of the court notes, *ante* at 15–16, we have on one occasion interpreted *Wardlow* as resting in part on the presence of the opaque bag. *Gordon v. United States*, 120 A.3d 73, 84 (D.C. 2015). Although I was a member of the division in *Gordon*, I have come to believe that *Gordon* is in this respect incorrect. More importantly, *Gordon* is contrary to our prior controlling opinion in *Wilson*, which the court did not mention in *Gordon*. Under the circumstances, we are required to follow *Wilson* rather than *Gordon*. *See, e.g.*, *Thomas v. United States*, 731 A.2d 415, 420 n.6 (D.C. 1999) ("Where a division of this court fails to adhere to earlier controlling authority, we are required to follow the earlier decision rather than the later one."). In any event, the grounds for reasonable articulable suspicion in this case are significantly stronger than those in *Wardlow* even taking into account Mr. Wardlow's possession of the opaque bag.

cases was comparable to the basis for suspicion in this case. *Ante* at 25–26. In fact, the basis for suspicion in each of the cited cases was substantially weaker than the basis for suspicion in the present case. *United States v. Lowe*, 791 F.3d 424, 434–35 (3d Cir. 2015) (suspect stopped based on anonymous tip did not flee before stop but rather at most "stepped back" in way that court determined was not suspicious); *United States v. Freeman*, 735 F.3d 92, 101–02 (2d Cir. 2013) (suspect stopped based on anonymous tip did not flee before stop but rather lawfully ignored police and kept on walking at same pace); *T.P. v. State*, 224 So. 3d 792, 794–95 (Fla. Dist. Ct. App. 2017) (although suspect did initially flee from police, anonymous tip consisted of "vague description of a light-skinned black male wearing shorts and a shirt looking through windows"); *Lee v. State*, 868 So. 2d 577, 578–83 (Fla. Dist. Ct. App. 2004) (anonymous tip provided no description of suspect other than race and gender, and suspect did not flee but rather "walked quickly" away from police).

Although this court has said that "'case matching' is of limited utility" in deciding Fourth Amendment issues, *Gomez v. United States*, 597 A.2d 884, 889 (D.C. 1991), we have also acknowledged that prior "cases are helpful illustrations of the factors that may add up to reasonable suspicion in the totality of the circumstances." *Hampleton v. United States*, 10 A.3d 137, 144 n.9 (D.C. 2010).

In my view, the opinion of the court contradicts clear guidance that we must take from the prior decisions of the Supreme Court and this court.

## III.

The opinion of the court relies heavily on the view that Mr. Miles's flight was "provoked" by the officers, and thus was significantly less suspicious than unprovoked flight. *Ante* at 14–26. I disagree.

In concluding that Mr. Miles's flight was provoked, the opinion of the court relies on trial evidence that Officer Sanchez drove onto the sidewalk in order to block Mr. Miles's path. *Ante* at 21. It is unclear, however, whether this court can appropriately "rely on undisputed trial evidence to . . . reverse the trial court's ruling, where the losing party failed to renew the motion to suppress based on the new evidence at trial." *Wade v. United States*, 173 A.3d 87, 92 (D.C. 2017) (citing *United States v. Hicks*, 298 U.S. App. D.C. 225, 227, 978 F.2d 722, 724 (1993) ("The problem for Hicks is that he did not again move to suppress when this evidence came to light at trial. An appellate court should not rely on evidence first produced at trial to reverse a pre-trial denial of a suppression motion not renewed at trial.")).

Even if taking such an approach might be appropriate in some circumstances, doing so in the present case is unwarranted, because the trial testimony at issue was not undisputed. To the contrary, there was conflicting evidence about whether Officer Sanchez pulled onto the sidewalk before Mr. Miles fled. Officer Davis's suppression-hearing testimony indicated that Mr. Miles fled before Officer Sanchez drove past her cruiser and towards Mr. Miles. Officer Davis's trial testimony was to the same effect. Officer Sanchez's suppression-hearing testimony -- the version that the trial court adopted at the close of the suppression hearing -- indicated that Officer Sanchez blocked the sidewalk before Mr. Miles fled, but did not indicate that Officer Sanchez drove up onto the sidewalk. Officer James's trial testimony was similar in that respect to Officer Sanchez's suppression-hearing testimony. For his part, Mr. Miles denied at trial that he fled and did not testify that any officer drove up onto the sidewalk. In sum, the opinion for the court adopts a version of the events -- that Mr. Miles fled after Officer Sanchez drove up onto the sidewalk to block Mr. Miles's path -- that the trial court never found, that no witness testified to, and that was contradicted by the testimony of several witnesses, including Mr. Miles himself. Whatever its proper scope, the doctrine permitting reliance on undisputed trial evidence surely does not authorize this court to reverse the trial court based on such a patchwork version of the facts.

It is true, as the opinion for the court notes, that "[n]o one balked" at trial when Officer Davis testified that Officer Sanchez drove up onto the sidewalk after Mr. Miles had started running. *Ante* at 22 n.17. In isolation, though, that testimony would have given no one reason to balk. And if Mr. Miles wanted to argue that his flight was provoked by Officer Sanchez's driving onto the sidewalk, he should have developed evidence to that effect at the suppression hearing. Failing that, he should have renewed his suppression motion at trial, so that the parties could have made a record on the issue and the trial court could have made an informed finding. Because Mr. Miles neither elicited pertinent testimony at the suppression hearing nor renewed his suppression motion at trial, this court has no valid basis upon which to conclude that Officer Sanchez drove up onto the sidewalk before Mr. Miles fled.

In support of its conclusion that Mr. Miles's flight was provoked, the opinion of the court also relies on Officer Sanchez's testimony that Officer James was walking behind Mr. Miles before Mr. Miles fled. *Ante* at 22. That is irrelevant, however, in the absence of any indication that Officer Sanchez had reason to believe that Mr. Miles was aware of Officer James's presence some twenty to twenty-five feet behind Mr. Miles. *See generally, e.g., Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014) ("[The] reasonableness of a particular seizure under the Fourth Amendment" is analyzed "from the perspective of a

reasonable officer on the scene, rather than with the 20/20 vision of hindsight.") (internal quotation marks omitted). Even if one were to assume that Officer Sanchez did have reason to believe that Mr. Miles had seen Officer James, the police conduct in this case would still be substantially less provocative than the conduct in *Henson v. United States*, 55 A.3d 859, 862, 868–70 (D.C. 2012) (rejecting argument that suspect's flight was provoked, where suspect fled after uniformed officer grabbed suspect's arm and said words to effect of "[W]here are you going?"). The same is true even if Officer Sanchez actually drove his cruiser up onto the sidewalk to block Mr. Miles's path, given the absence of any suggestion that Officer Sanchez drove at a high rate of speed or was dangerously near to Mr. Miles. For these reasons, I cannot agree with the opinion of the court that the officers in this case should have realized that their conduct was so provocative that Mr. Miles's flight "fail[ed] to raise an inference of a guilty conscience." *Henson*, 55 A.3d at 869.

The 911 call in this case that a man was shooting a gun might have been baseless, even though officers confirmed its innocent details. The face-to-face report about the suspect's location might also have been baseless. And Mr. Miles might have had innocent reasons for fleeing from the police. As the Supreme Court has repeatedly held, however, "reasonable suspicion need not rule out the possibility of innocent conduct." *Navarette*, 135 S. Ct. at 1691 (internal quotation

marks omitted). *See generally, e.g.*, *United States v. Arvizu*, 534 U.S. 266, 277 (2002) ("Undoubtedly, each of these factors alone is susceptible of innocent explanation, and some factors are more probative than others. Taken together, we believe they sufficed to form a particularized and objective basis for . . . stopping the [suspect], making the stop reasonable within the meaning of the Fourth Amendment."). In my view, controlling precedent establishes that the officers' decision to stop Mr. Miles was lawful. I therefore respectfully dissent.