*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 23-FS-0589

IN RE R.W.; APPELLANT.

Appeal from the Superior Court
of the District of Columbia
(2023-DEL-000106)

(Hon. Robert Salerno, Trial Judge)

(Argued March 12, 2025                    Decided May 1, 2025)

*Sarah McDonald*, Public Defender Service, with whom *Samia Fam* and *Stefanie Schneider*, Public Defender Service, were on the briefs, for appellant.

*Ivan Cody, Jr.*, Assistant Attorney General, with whom *Brian L. Schwalb*, Attorney General, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, *Carl J. Schifferle*, Deputy Solicitor General, and *Elissa R. Lowenthal*, Assistant Attorney General, were on the brief, for the District of Columbia.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and BECKWITH and SHANKER, *Associate Judges*.

SHANKER, *Associate Judge*: Around 2:00 a.m. on a February morning in 2023, District of Columbia Metropolitan Police Department Officer Clifford Vanterpool, responding to a dispatch call, drove up to a residential building parking lot and saw two people run from a parked car, leaving the car's rear door open as they fled. Officer Vanterpool pulled into the lot and saw the car begin to back out but then

stop.  He parked perpendicular to the vehicle's rear to prevent it from leaving, exited his car, drew his service weapon, and yelled to the vehicle's driver to put his hands up.

Based on evidence obtained after these events, Officer Vanterpool arrested the car's driver, appellant R.W.  Prior to trial for multiple offenses stemming from that arrest, R.W. moved to suppress all evidence obtained after Officer Vanterpool told him to put up his hands, contending that Officer Vanterpool lacked reasonable articulable suspicion to seize him.  The trial court denied the motion, relying on four facts that in its view justified the seizure: (1) the radio dispatch received by Officer Vanterpool that told him to be on the lookout for a suspicious vehicle, (2) the flight of the two people from the vehicle, (3) the late hour at which the events occurred, and (4) R.W.'s decision to reverse the car with a door still open.  After his conviction, R.W. timely appealed the motion's denial.

We reverse and remand.  The trial court committed two legal errors in the course of its reasonable-suspicion analysis.  First, the court erred by factoring the radio dispatch into its reasonable-suspicion determination without more—indeed, without any—information about its source and reliability.  Second, because the facts known to Officer Vanterpool did not suggest that R.W. was engaged in a suspicious joint venture with his two companions, the trial court should not have imputed the

companions' flight to R.W. Once we excise the radio dispatch and the conduct of R.W.'s companions from the analysis, we conclude that the lateness of the hour and the slight movement of the car did not give rise to reasonable articulable suspicion that R.W. was involved in criminal activity.

The question remains whether exclusion is the appropriate remedy for the Fourth Amendment violation. The District argues on appeal that exceptions to the exclusionary rule apply, but it (1) never argued before the trial court that the exclusionary rule would not apply to some or all of the evidence obtained after R.W.'s seizure and (2) now identifies no exceptional circumstances justifying its failure to so argue. Accordingly, we conclude that exclusion of all fruits of the unlawful seizure is warranted, and we vacate R.W.'s convictions and remand for further proceedings.

## I.      Factual and Procedural Background

As neither party contends that the trial court's factual findings following the suppression hearing were clearly erroneous, we distill the background below from those findings. Where necessary, we supplement the trial court's findings with evidence introduced at the suppression hearing.

## A. The Seizure

While on patrol after midnight on a February morning, Officer Vanterpool received a radio dispatch call directing him to 514 Ridge Road, SE, in the District. The dispatcher told Officer Vanterpool to be on the lookout for a "suspicious vehicle." The trial court found that the District did not establish what Officer Vanterpool "was told about why the vehicle was suspicious."

Officer Vanterpool drove to the address, circled two nearby streets, and pulled into a parking lot at the rear of the building at around 2:00 a.m. He then saw two "guys" exit a car, look at him, and run, at which point he radioed into dispatch that he had "two running." As he pulled closer to the vehicle from which the two had fled, he noticed the vehicle—with its rear driver's-side door open—begin to back out of its parking spot.[1]

The rest of the events are visible on Officer Vanterpool's body-worn camera footage. Officer Vanterpool parked his car behind the vehicle, which by this point was stopped within its parking spot roughly adjacent to vehicles on either side. He radioed for backup and exited his squad car. Next, he yelled to the vehicle's driver,

---

[1] Officer Vanterpool also testified that the vehicle "went back in" to the parking spot as he approached. The trial court, however, made no finding with respect to this assertion. Instead, it found only that the car backed up.

"Hey, put your hands up," and walked to the driver's-side door, drawing his service weapon as he did so. When he reached the door, he saw R.W. behind the wheel. Both parties and the trial court agreed that a Fourth Amendment seizure occurred at that point.

## B.    Evidence Collected at the Scene

In response to a series of questions, R.W. told Officer Vanterpool that the car was "just sitting [there]," that it was "a smoking car," and that he was in the car to smoke. He also stated that he did not have identification with him and that he was fifteen years old.

Officer Vanterpool asked R.W. to exit the car and examined the inside, at which point he noticed that the car's ignition had been "punched," or damaged, in a way that in his experience was associated with car theft. He and other responding officers ran the car's license plate number and discovered that the car had been reported stolen.

## C.    Proceedings Below

The District charged R.W. with unauthorized use of a motor vehicle, felony receipt of stolen property, unlawful entry of a motor vehicle, and operating a vehicle in the District of Columbia without a permit. Before trial, R.W. moved to suppress

all evidence obtained after Officer Vanterpool told him to put his hands up. As relevant to this appeal, R.W. contended that Officer Vanterpool seized him without reasonable suspicion in violation of the Fourth Amendment.

Following a suppression hearing, the trial court denied R.W.'s motion. The court agreed that Officer Vanterpool seized R.W. at the moment he first stated "put your hands up." But according to the court, the facts known to Officer Vanterpool at that time gave rise to reasonable articulable suspicion sufficient to justify the seizure. The court relied on four facts to support this determination: (1) Officer Vanterpool had received a call regarding a suspicious vehicle at a specified address, (2) the officer saw "two persons fleeing from a vehicle," (3) "[i]t was almost 2 a.m.," and (4) as Officer Vanterpool approached the car, it began "backing out of the parking space . . . while the rear driver's side door [was] still open."

In an incorporated bench trial, the trial court adjudicated R.W. delinquent on all counts. The court assigned R.W. to one year of probation with conditions, and this appeal followed.

## II.    Analysis

We first address whether Officer Vanterpool's seizure of R.W. was supported by reasonable articulable suspicion. Concluding that it was not, we proceed to the

District's argument that we should "remand the case for further proceedings to determine what evidence should be suppressed." We reject this request. The District had the opportunity to present fruits-related, plain-view, and inevitable-discovery arguments to the trial court and declined to do so. We see no exceptional circumstances that justify overlooking the District's failure to preserve these arguments.

### A. Reasonable Articulable Suspicion

R.W. raises a single argument on appeal—that Officer Vanterpool lacked reasonable articulable suspicion sufficient to justify the seizure. Ordinarily, this argument would require us to resolve two issues: (1) whether and when the District seized R.W. and (2) if a seizure indeed occurred, whether the facts known to the officer at the time of the seizure gave rise to reasonable suspicion. *See, e.g.*, *Mitchell v. United States*, 314 A.3d 1144, 1150 (D.C. 2024). But as the District concedes that Officer Vanterpool seized R.W. when he first asked R.W. to put his hands up, we need only decide whether the facts then known by Officer Vanterpool created an objectively reasonable suspicion that criminal activity was afoot. *See Terry v. Ohio*, 392 U.S. 1, 21 (1968). Addressing the issue as framed, we resolve it in R.W.'s favor.

We begin with some background principles. "Even a brief restraining stop of a person is an unreasonable seizure in violation of the Fourth Amendment if it is

conducted for investigatory purposes without a reasonable suspicion supported by specific and articulable facts that the individual is involved in criminal activity . . . ." *Golden v. United States*, 248 A.3d 925, 933 (D.C. 2021) (internal quotation marks omitted). To determine whether a stop was supported by reasonable articulable suspicion, "a court must examine whether the totality of 'the facts available to the officer at the moment of the seizure . . . "warrant a [person] of reasonable caution in the belief" that [the stop] was appropriate.'" *Mayo v. United States*, 315 A.3d 606, 620 (D.C. 2024) (en banc) (alterations in original) (quoting *Terry*, 392 U.S. at 21-22). The District bears the burden of justifying a seizure, *Armstrong v. United States*, 164 A.3d 102, 113 (D.C. 2017), and may meet this burden through a showing "considerably less than proof of wrongdoing by a preponderance of the evidence," *Kansas v. Glover*, 589 U.S. 376, 380 (2020) (internal quotation marks omitted).

We review a trial court's denial of a motion to suppress de novo. *Maye v. United States*, 314 A.3d 1244, 1251 (D.C. 2024). When conducting this review, we defer to the trial court's findings of fact "unless they are clearly erroneous." *Hooks v. United States*, 208 A.3d 741, 745 (D.C. 2019). And we view those facts "in the light most favorable either to the prevailing party or to the court's ruling." *Mayo*, 315 A.3d at 617 (citation omitted). The path we follow during our analysis is by now well worn: "we first assess the legitimacy and weight of each of the factors" bearing on reasonable suspicion and "then weigh that information all together." *Id.*

at 621. That analysis leads us to conclude that Officer Vanterpool lacked reasonable articulable suspicion at the time he seized R.W.

## 1. The radio dispatch

The factor to which the trial court arguably assigned the most weight was the radio dispatch received by Officer Vanterpool, which directed him to 514 Ridge Road, SE, to investigate a "suspicious vehicle." We hold that the trial court erred in considering the radio dispatch; the dispatch should have played no role in the trial court's analysis.

R.W. offers two reasons to discount the dispatch, both of which we embrace. First, we held in *In re T.L.L.* that "the fact that the officers had information leading them to [a specified address] can contribute to the articulable suspicion calculus only if the judge has been apprised of sufficient facts to enable him to evaluate the nature and reliability of that information." 729 A.2d 334, 341 (D.C. 1999). Here, as the trial court itself found, "we don't know what [Officer Vanterpool] was told about why the vehicle was suspicious"; indeed, we know nothing whatsoever about what motivated the dispatch. Because this case is just like *T.L.L, see id.* at 338 (pointing out that there was "no information in the record as to why the lookout directed officers to the address . . . at which T.L.L. was apprehended"), the District's efforts to distinguish that case fall flat.

As a division of this court, we are bound by *T.L.L.*  *See (Darnell) Hawkins v. United States*, 119 A.3d 687, 702 (D.C. 2015) ("[W]e cannot overrule the prior decision of another division of this [c]ourt.").  *T.L.L.*'s holding, moreover, is well founded, for three related reasons.  First, "failing to require a showing of reliability could enable an officer to bring about a lawful stop by the simple expedient of passing [information] on to another officer"—to prevent this outcome, "an officer may rely on a police lookout only to the extent that the lookout itself is based on reasonable suspicion."  *Jenkins v. United States*, 152 A.3d 585, 590 (D.C. 2017) (internal quotation marks omitted and alteration in original).  Second, the Fourth Amendment requires that a judicial officer make an *independent* determination that a police intrusion was justified.  *Whitely v. Warden*, 401 U.S. 560, 564 (1971).  Where a court instead *assumes* that a police dispatcher has solid information underlying the dispatch that directed the seizing officer to the person seized, it abdicates this function.  *See id.* at 564-68.  Third, while it may be the case that a dispatch gives a police officer a subjective basis to assume that something is afoot, without any information about the basis for the dispatch, there is no way to determine whether suspicion of criminal activity was objectively reasonable, which is the

touchstone of the Fourth Amendment. *See (Nathan) Jackson v. United States*, 157 A.3d 1259, 1264 (D.C. 2017).[2]

Even if *T.L.L.* did not control, there is a second reason to reject the radio dispatch. The content of the dispatch—which, so far as the trial court found, directed Officer Vanterpool to look only for a suspicious vehicle—was so broad as to be useless. In *Armstrong*, we explained that a lookout identifying "a white car, possibly a Mercury Sable, with tinted windows and two black males" lacked "the particularized specificity necessary to warrant the stopping of any vehicle within the District." 164 A.3d at 108. This was so, we clarified, because such a broad description could not support the required finding of "*particularized* reasonable suspicion"—it would allow the police to stop too broad a universe of potential suspects. *Id.* (emphasis added). As the content of the dispatch here is even less particularized than the dispatch we rejected in *Armstrong*, reliance on it would pose even greater constitutional concern.

The District's counterarguments are unpersuasive. The District first suggests that "it was reasonable to infer that the suspicious vehicle reported through the radio

---

[2] Put differently, a dispatch will always support a police officer's subjective state of alert upon arriving at the identified area. But in terms of an objectively reasonable basis to believe that criminal activity is afoot, a dispatch based on information that, for example, gun shots were heard is meaningfully different from a dispatch based on information that loud music was heard.

dispatch was the vehicle that R.W. was operating." This assertion, however, fails to wrestle with *T.L.L.*'s holding—that a dispatch is *irrelevant* to the Fourth Amendment analysis absent information allowing the trial court to evaluate its basis and reliability. The District does not, and cannot, identify such information in the record.

Second, the District, relying on language from *Armstrong*, argues that "an imperfect description, coupled with close spatial and temporal proximity between the reported crime and seizure, can justify a *Terry* stop." But this case, unlike *Armstrong*, does not involve a specific, reported crime in combination with an amorphous description of its perpetrators. 164 A.3d at 104-06 (explaining that the lookout for a white Mercury Sable was issued in response to two eyewitness reports of related robberies). Instead, the radio dispatch referenced only a "suspicious vehicle." We do not see how *Armstrong*'s reference to spatial and temporal proximity to an underlying crime is relevant where, as here, no underlying crime appears to have been reported.

Accordingly, the trial court erred by weighing the radio dispatch when assessing whether the seizure was supported by reasonable suspicion.

### 2. The flight of two other individuals

The next most important consideration relied on by the trial court was the "completely unprovoked" flight of two other people from the vehicle. The trial court suggested that the flight of these individuals cast suspicion onto R.W. Although the flight of another can be relevant to the reasonable-suspicion analysis if the facts known to the officer suggest that the involved parties were engaged in a suspicious joint venture, the trial court here erred in giving weight to the flight of R.W.'s companions.

"The courts in the District of Columbia have . . . rejected articulable suspicion arguments based upon guilt by association." *(John) Smith v. United States*, 558 A.2d 312, 315 (D.C. 1989) (en banc); *see also Irick v. United States*, 565 A.2d 26, 30 (D.C. 1989) ("We agree that guilt by association is a very dangerous principle . . . ."). Sound reasoning underlies this rejection. "Seizures based on guilt by association run afoul of the bedrock Fourth Amendment requirement of particularized suspicion to conduct a *Terry* stop." *Bennett v. United States*, 26 A.3d 745, 751 (D.C. 2011) (internal quotation marks omitted). And as a matter of common sense, we agree with R.W. that "a passenger might flee because he had a gun on his person, because he knew that he had an outstanding warrant or was violating curfew, or for innumerable other reasons that would not support suspicion"

with respect to other individuals in the car. *Cf. also Mayo*, 315 A.3d at 625-26 (recognizing "myriad reasons an innocent person might run away from police," such as "a natural fear or dislike of authority" or "fear of police brutality," and pointing out that the Supreme Court has declined to adopt a bright-line rule that flight upon the sight of an officer justifies a stop (internal quotation marks omitted)).

Both parties agree, however, that the "flight of one person from authority may imply the guilt of another" in limited circumstances—specifically, when "circumstances indicate that the two were engaged in a joint venture." *Black v. United States*, 810 A.2d 410, 413 (D.C. 2002).

Of course, the parties differ in their definition of a "joint venture." The District seems to interpret a "joint venture" as equivalent to mere association, arguing that because R.W. and the two other persons "were all in a small vehicle together," it is "highly unlikely that the vehicle's driver had no association with his passengers." R.W., by contrast, contends that the evidence must support "an inference of a joint *criminal* venture."

The District's definition cannot be correct for two reasons. First, the District's definition is in direct tension with *(John) Smith* and the cases upon which it relied. The District's test would forbid imputing one person's flight to her companion only where the facts known to the officer suggest the fleeing party had "no association"

with the one who remains. Thus, the District would have us infer guilt from mere association. This we cannot do. *See Sibron v. New York*, 392 U.S. 40, 62-64 (1968) (rejecting argument that a police officer reasonably suspected drug dealing when he saw the defendant speaking with "a number of known narcotics addicts over a period of eight hours" because "[s]o far as [the officer] knew, they might indeed have been talking about the World Series" (internal quotation marks omitted)).

Second, the very case on which the District relies—*Black*—is incompatible with the District's definition of joint venture. *Black* explained that evidence of innocent association—a "one-way exchange" in an area known for drug trafficking—is generally "insufficient to justify a stop." 810 A.2d at 412 (internal quotation marks omitted). Instead, the facts known to the officer must suggest that a suspicious exchange—where drug trafficking is concerned, a "two-way exchange" of currency for an object—is ongoing. *See id.*

Of course, the fact that the District is incorrect does not mean that R.W.'s definition is the right one. The difficulty posed by R.W.'s "criminal joint venture" proposal is that suspicious association presents as a spectrum, not as a binary. On the innocent end, there is the unfortunate patron who happened to be present in a bar at the time police officers executed a search warrant directed at the bar and the bartender. *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). On the guilty end, we can

imagine a police officer witnessing two persons, both wearing identical masks, run into a bank with weapons drawn—clearly a *criminal* joint venture. But innumerable situations exist between those two poles. A joint venture does not leap from innocent to criminal in one fell swoop—persons can associate in a suspicious manner even if a police officer has not yet witnessed them engage in specific criminal conduct together. *Cf. Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (explaining that officers need not prove criminal conduct by a preponderance of the evidence to conduct a *Terry* stop). We therefore reject R.W.'s "criminal joint venture" test and instead ask whether the facts known to Officer Vanterpool gave rise to the reasonable inference that R.W. and the two fleeing persons were associated in a suspicious manner.

Because here the only fact associating R.W. and the other two occupants of the vehicle at the time of the seizure was their altogether mundane presence in the same car, we answer this question in the negative. *See, e.g.*, *Perkins v. United States*, 936 A.2d 303, 308-09 (D.C. 2007) (declining to infer a common enterprise from the mere fact that a passenger and driver were in the same car). Accordingly, the trial court erred by weighing the flight of R.W.'s two companions against R.W. in its reasonable-suspicion analysis.

### 3.     The time of night

The trial court next relied on the time of night at which Officer Vanterpool encountered R.W.: approximately 2:00 a.m.  To be sure, the "lateness of the hour at which the stop occurred" is "among the relevant contextual considerations in a *Terry* analysis."  *(Tyrone) Jackson v. United States*, 56 A.3d 1206, 1214 (D.C. 2012) (internal quotation marks omitted); *see also Funderburk v. United States*, 260 A.3d 652, 658 (D.C. 2021) ("He was not stopped at a time and place"—2:20 a.m. on a December weeknight—"when one would expect to find people going about their normal business.").  The trial court thus did not err by weighing this factor in favor of reasonable suspicion.

But our precedents teach that the time at which police interact with a suspect often receives only slight weight in the totality analysis.  *See (Donald) Jones v. United States*, 391 A.2d 1188, 1191 (D.C. 1978) ("The fact that the officer encountered the two men during the early morning hours in an area where there had been robberies and drug trafficking certainly did not [alone] provide a basis for the 'seizure.'"); *see also United States v. Bellamy*, 619 A.2d 515, 522 (D.C. 1993) (explaining that the late hour at which an interaction occurs is more relevant to an officer's "potential vulnerability" (and therefore the reasonableness of a frisk for weapons) than it is to "the intent of the suspect").  Indeed, we have said that "the

lateness of the hour at which the stop occurred is merely a background consideration." *Robinson v. United States*, 76 A.3d 329, 340 n.22 (D.C. 2013) (internal quotation marks omitted).

This treatment is consistent with our mandate in reasonable suspicion cases, which is to apply our common sense and give weight to the "factual and practical considerations of everyday life." *Mayo*, 315 A.3d at 620 (quoting *Ornelas v. United States*, 517 U.S. 690, 695 (1996)). In a busy city like the District, people have numerous innocent reasons to be out at night—partying, a night shift, walking a dog, an emergency diaper run. And we have recognized that behavior "capable of too many innocent explanations" is due less weight where reasonable suspicion is concerned. *Golden*, 248 A.3d at 941 (internal quotation marks omitted).[3]

Finally, R.W.'s age does not change our analysis. The District asserts that 2:00 a.m. was "an unusual time for individuals—and especially teenagers—to be occupying a residential parking lot," but the record does not suggest that Officer Vanterpool knew the age of the occupants of the vehicle prior to R.W.'s seizure. In any event, at the risk of appearing to generalize our own experiences—a tactic we

---

[3] So as not to be misunderstood, we reiterate that the time of night at which an officer witnesses conduct can still be a significant consideration. Even in a busy city like the District, context might reduce the number of innocent explanations for a person's presence in a particular place late at night.

studiously avoid in Fourth Amendment cases—we know that teenagers (including, at a point now far removed, ourselves) might be out and about at 2:00 a.m. for reasons entirely unrelated to criminal activity. We do not believe that, as a matter of common sense, three teenagers spending time together in a car in the early morning hours is particularly suspicious. Accordingly, we assign weight—but little weight—to the time when R.W.'s seizure occurred.

### 4. The movement of the vehicle

The final consideration emphasized by the trial court was the fact that, as Officer Vanterpool approached, the car "back[ed] out of the parking space . . . while the rear driver's side door [was] still open." The District relies heavily on this consideration—it argues that when "R.W. began to back out of the parking space," his conduct "could reasonably be understood as flight." And the District goes further—it suggests that R.W. was engaged in headlong, reckless flight because the car's door was open as R.W. backed up. *Cf. Wardlow*, 528 U.S. at 124 ("[H]eadlong flight . . . is the consummate act of evasion . . . .").

We do not share the District's view of the movement of the car. We recognize that "a defendant's flight can be a relevant factor in the reasonable suspicion analysis." *Miles v. United States*, 181 A.3d 633, 641 (D.C. 2018). But the weight assigned to such flight depends on its incriminating character, that is, the degree to

which it indicates consciousness of guilt. *See id.* at 644. Given what the record reveals about the limited movement of the car, we do not place the conduct R.W. engaged in here in the particularly incriminating category.

Our skepticism flows from both Officer Vanterpool's body-worn camera footage and his description of R.W.'s "flight." By the time Officer Vanterpool was out of his vehicle and approaching R.W.'s, his body-worn camera shows the car stopped within its parking spot. Indeed, the unoccupied car to the right of R.W.'s protrudes further back into the parking lot than does R.W.'s. So, based on our review of the footage, the car could not have traveled more than a foot or so, in what appears to be no more than about six seconds, before coming to a stop again.[4] To be clear, the trial court found that the car backed up, and we see no clear error in that finding. But the trial court made no findings with respect to the car's speed or the distance it traveled, and our own observations from the body-worn camera footage shed further light on these circumstances. *See (Dominique) Hawkins v. United States*, 248 A.3d

---

[4] As we noted above, Officer Vanterpool also testified that the vehicle pulled back into its spot as Officer Vanterpool approached in his patrol car. But the trial court did not adopt this testimony in its findings, we think for good reason. Officer Vanterpool's body-worn camera footage shows that the reverse indicators in the car's taillights were on as Officer Vanterpool walked up to the car. To credit Officer Vanterpool's testimony that the car pulled back in again, one would have to believe that R.W. shifted into reverse and pulled partially out of his spot, shifted into drive and pulled back in, and then shifted into reverse *again*, all in the few seconds it took Officer Vanterpool to pull up perpendicular to the rear of the vehicle. We find that set of circumstances unlikely.

125, 130 (D.C. 2021) (noting our obligation to conscientiously review the record, including video footage, even if that obligation neither makes us finders of fact nor changes our standard of review).

Turning to Officer Vanterpool's testimony, none of his descriptors suggests reckless movement by the vehicle. He testified only that the vehicle "started to back out." Those are not the words one typically uses to describe the type of sudden acceleration that we would consider headlong flight.

The District emphasizes that the vehicle's rear driver's-side door was open as R.W. backed up—presumably left open by his two companions who ran from the scene.[5] But given how slight the backwards movement of the car was, we think the open door adds little to the reasonable suspicion calculus.[6] Moreover, the open door

---

[5] The District suggests that the brief movement of the car with the door open could constitute either reckless driving under D.C. Code § 50-2201.04(b) or a violation of 18 D.C.M.R. § 2214.3, which bars operating a motor vehicle "with any front door(s), sidedoor(s), or rear door(s) tied open or swinging." The District wields these provisions, however, only to argue that this court should categorize R.W.'s driving as "headlong" flight. Indeed, when pressed at oral argument, the District disclaimed any argument that Officer Vanterpool had independent probable cause to stop R.W. for a violation of, for instance, Section 2214.3. We accordingly adhere to our "basic principle of appellate jurisprudence that points not urged on appeal are deemed to be waived" and decline to proceed down a path unpaved by the District. *See Rose v. United States*, 629 A.2d 526, 535 (D.C. 1993).

[6] The trial court did not find, and the record does not indicate, that Officer Vanterpool was aware of the open door at the time he seized R.W., but because we do not find the open door dispositive, we assume that he was.

is capable of too many innocent explanations, which, as we noted in our analysis of the time of the stop, weighs against a reasonable-suspicion finding. *See Golden*, 248 A.3d at 941. For instance, as R.W. points out, he may not even have noticed that his companions left the door open during the brief time in which his car reversed.

In sum, we place the movement of the vehicle at the lower end of incriminating and therefore accord it only slight weight in the reasonable suspicion analysis.

### 5. The totality of the circumstances

Having walked through each of the factors relied on by the trial court, we now weigh them in their totality. *See Mayo*, 315 A.3d at 636-37. As stated above, neither the radio dispatch nor the flight of R.W.'s two companions plays a role in our analysis. Therefore, we turn to the two remaining facts known to Officer Vanterpool: (1) it was 2:00 a.m. and (2) R.W. reversed a few feet in a parking spot while the vehicle's rear door was open. Even viewed together, these two facts do not give rise to reasonable articulable suspicion that criminal conduct was afoot. *See (Donald) Jones*, 391 A.2d at 1191 (holding that presence in an automobile during the early morning and movement (there, appearing to hide something under a seat) in response to the sight of an officer did not justify a *Terry* stop). Accordingly, we

reverse the denial of R.W.'s motion to suppress the evidence obtained as a result of his unlawful seizure.

## B.  Remand

The District contends that, if we reverse, we "should remand the case for further proceedings to determine what evidence should be suppressed." Specifically, the District suggests that it "has strong arguments that, even if the initial stop was unconstitutional, the evidence obtained afterwards is independently admissible under the plain view and inevitable discovery doctrines."

Although we doubt that the District's arguments are as powerful as it contends,[7] we need not reach their merits.  Despite having the opportunity to do so, the District never argued before the trial court that any evidence recovered after the seizure (1) should not be considered a fruit of the seizure, (2) would have inevitably been discovered through an already ongoing, lawful process, or (3) was in plain view when Officer Vanterpool was lawfully within sight of the evidence.  And when faced

---

[7] *See (Prince) Jones v. United States*, 168 A.3d 703, 718 (D.C. 2017) (explaining that the inevitable-discovery doctrine applies where "the police engaged in lawful and unlawful processes in parallel," not where, as here, "the police had mutually exclusive options and . . . chose the option that turned out to be unlawful"); *West v. United States*, 100 A.3d 1076, 1083-84 (D.C. 2014) (noting that the plain-view exception to the Fourth Amendment applies only where police can see an incriminating object from a *lawful position*).

with the government's failure to preserve such arguments in the past, we have denied the government a second bite at the apple absent exceptional circumstances. *See (Gregory) Smith v. United States*, 283 A.3d 88, 98 (D.C. 2022) (explaining that the government's failure to preserve an inevitable-discovery argument in the trial court "would permit [this court] to bypass it" unless "exceptional circumstances" were present (internal quotation marks omitted)); *Barnett v. United States*, 525 A.2d 197, 200 (D.C. 1987) ("We are not persuaded that the government should have a second chance to elicit facts supporting an affirmance of the trial court's ruling as the record indicates that it had a full and fair opportunity to present whatever facts it chose to meet its burden of justifying the warrantless arrest and resulting search and seizure.").

The District has identified no circumstances suggesting that its ability to present its exclusion-related arguments was unfairly curtailed. At oral argument, the District explained only that its "focus" during the suppression proceedings was on reasonable suspicion *vel non* and not on exceptions to the exclusionary rule. That, of course, simply underscores that the District forfeited the arguments. Accordingly, we follow *Barnett* and decline to remand for further suppression-related proceedings. As R.W. moved to suppress "any [post-seizure] observations and statements obtained from [R.W.] in this case"—and the trial court relied on those

observations and statements to convict R.W.—we vacate R.W.'s convictions.[8] *See (Gregory) Smith*, 238 A.3d at 99.

### III.   Conclusion

For the foregoing reasons, we reverse the trial court's denial of R.W.'s motion to suppress, vacate R.W.'s convictions, and remand for further proceedings consistent with this opinion.

*So ordered*.

---

[8] The District does not argue that admission of the unlawfully obtained evidence was harmless.